JoNes, Chief Judge,
delivered the opinion of the court:
This is a Lucas Act case.[1] According to the terms of the act authority was granted to settle equitable claims arising out of contracts performed between September 16,1940, and August 19, 1945. In order to have the benefit of the act it was made necessary that the claimant fulfill certain procedural and other requirements, including a showing that it had sustained a net loss on all of the contracts which it had with the Government during the period in question.
The defendant makes no issue as to the fulfillment of any other conditions, but it alleges that plaintiff completely failed to show a net loss on the various contracts which it performed with the Government during the statutory period.
The one issue, therefore, is whether the plaintiff sustained an over-all net loss on such contracts.
The commissioner who personally conducted the trial has found that the evidence fails to show that plaintiff sustained a net loss during the period in question. The findings are clearly stated, are sustained by the record, and we have adopted them without substantial change as the findings of the court.
During the statutory period plaintiff performed work either as a contractor or subcontractor or furnished supplies and services to the United States on more than 20 contracts with various agencies of the Government.
Among these contracts with the defendant were two with the War Department for the manufacture of ammunition *560 boxes. For convenience these will be referred to as contracts Nos. 1 and 2.
Contract No. 1 was dated February 10,1943. By its terms plaintiff was to furnish and deliver 500,000 ammunition boxes for the stipulated price of $452,226.67. By the terms of contract No. 2, dated May 9,1944, plaintiff agreed to furnish and deliver 411,000 ammunition boxes for a stipulated price of $381,303.48.
Plaintiff made appropriate written requests for relief under the War Powers Act, known as the Lucas Act, to which reference has been made.
As is set out in finding 10 plaintiff alleges a net operating loss for the years 1943-45 combined, in connection with contracts it performed for the Government, in the sum of $122,797.21.
During the years 1943 and 1944 plaintiff manufactured and sold certain refrigerator parts to the Success Manufacturing Company, a wholly owned subsidiary of the plaintiff, and rendered invoices for which it received $325,411.79. The plaintiff’s recorded costs for the manufacture of these articles was $160,969.79. The plaintiff thus actually received a profit on this contract of $164,442, which it failed to include in the detailed statement which it made in calculating its alleged net operating loss.
Its asserted reason for not including this item was that the sum of $164,442 was not a profit but only a transfer of funds to the plaintiff from its subsidiary which plaintiff effectuated by rendering to Success Manufacturing Company bills equal to double the costs of the work. However, plaintiff’s subcontract or other agreement with Success Manufacturing Company is not in evidence and plaintiff’s repudiation of a profit motive in the performance of the work indicated is not substantiated in the record. The Success Manufacturing Company was during the period a prime contractor in other contracts with the Government.
During the performance of the contract a number of the ammunition boxes were rejected by the defendant. At the time of the rejection the manufacturing operations for most of these boxes had been completed. Thus the material and labor costs that had been incurred .up to the time of rejection *561 were substantially the same as the labor and material costs in connection with the boxes that were accepted.
Later the plaintiff conditioned the rejected boxes and disposed of them in its civilian trade. During the years in question it thus realized the sum of $114,754.42. In its statement in respect to these rejected boxes the plaintiff included the full sales price as its costs which it credited to civilian sales.
In making its statement of losses on Government contracts it made no adjustment for the material and labor costs which had been incurred on these boxes prior to their rejection. It is not reasonable to assume that the amount of costs adopted by plaintiff represented the costs incurred by it in conditioning the rejects alone, or that the amount is over and above the costs incurred in their manufacture prior to rejection and charged in the claim as Government costs. The trial commissioner has found that the cost value of the rejects which had been charged to Government costs can be reasonably calculated in the light of the entire record as $90,100.92.
Plaintiff earnestly contends, as indicated, that the $164,442 book profit which it earned in connection with the sales to its subsidiary was merely a transfer of funds between parent and subsidiary, and should not be considered as a realized profit for the purposes of this case. If this were true then it certainly would have been necessary, in order to meet the statutory tests, that plaintiff list its gains on all Government' contracts of its subsidiary as its alter ego in order to reach plaintiff’s over-all net profit or loss. This was not done. It evidently wanted to treat its subsidiary as a separate entity. This puts it in the position of claiming that regardless of whether its subsidiary may have earned profits on Government contracts which are available for plaintiff’s use through a transfer of funds, such profits, if any, should not be taken into consideration in determining whether plaintiff had a net loss.
When the entire record is considered we find, as set out in finding 21, that plaintiff’s operations on Government contracts and subcontracts in the years 1943-45 showed a substantial profit rather than a net loss.
*562 The plaintiff’s petition is dismissed.
Laeamore, Judge; Maddest, Judge; Whitaker, Judge; and Littleton, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner William E. Day, makes findings of fact as follows:
1. The plaintiff is a corporation organized and existing under the laws of the State of Maine, having its principal place of business in Portland, Maine.
2. Between September 16,1940, and August 14,1945, plaintiff performed work, either as contractor or subcontractor, or furnished supplies or services to the United States, on upwards of 20 contracts with various agencies of the Government.
3. The plaintiff’s action, founded upon the Lucas Act (60 Stat. 902 and 62 Stat. 992), seeks to recover losses which it claims were sustained in the performance of one of such contracts (W241-OKD-2719).
A claim is also made for a price differential between the cost of mill steel and warehouse steel under another contract.
As to the Lucas Act claim, no serious contention is made by the defendant regarding fault or negligence. It is accordingly found that there was no fault or negligence by the plaintiff in the performance of the work.
Apart from the effect of the written requests for relief upon which the plaintiff relies, the main contention between the parties is whether or not the plaintiff actually sustained a loss on all Government contracts during the statutory period.
4. Among the contracts entered into by plaintiff with defendant, acting through the War Department, were contracts for the manufacture of ammunition boxes, the first dated February 10, 1943, to furnish and deliver 500,000 ammunition boxes for $452,226.67, No. W241-OBD-2719, which has been received in evidence as plaintiff’s exhibit 6; and another dated May 9, 1944, whereunder plaintiff undertook to furnish and deliver 411,000 ammunition boxes for a total con *563 tract price) of $381,303.48, No. W3.9-020-OED-2462, which has been received in evidence as plaintiff’s exhibit 7.
5. Prior to August 14,1945, plaintiff filed requests for First War Powers Act relief with regard to contracts' Nos. W241-OED-2719 and W19-020-OBD-2462, which claims were never favorably considered by the War Department. Such requests for relief upon which the plaintiff relies are contained in the following two letters:
September 2, 1944
Subject: Eequest for Eelief under Executive Order #9001, Contract No. W241-OED-2719 Box, Ammunition Cal. .50 M2
Gentlemen: Supplementing Petition for reimbursement under Executive Order #9001, filed August 22, 1944
Eequest is made herewith to withdraw from consideration our petition dated July 1,1944.
We respectfully request reconsideration of our revised petition dated August 22, 1944 and in reference to paragraphs' of our petition Nos. 6, 7 and 8 of our letter of August 22nd we wish to state that relief under Executive Order No. 9001 is vital to this corporation’s contribution to the war effort for the following reasons:
A. The losses sustained by this Corporation in the performance of Contract W241-OED-2719 have seriously impaired its credit standing.
B. The sustained losses were not foreseeable and were caused by circumstances beyond the control of this Corporation, such as wage increases, advances in prices paid for raw materials and other causes as hereinbefore mentioned under Paragraph 3, of our letter of August 22, 3.944. _
_ C. This Corporation’s facilities are now being used to 95% of its capacity on vital war work, and without cooperative relief their contribution to the war effort will be severely impaired.
D. This Corporation employs 275 (more or less) people of which at least 200 are heads of families and their employment security might well be in jeopardy should this petition be denied.
Will you kindly grant us an opportunity to discuss this matter further with you ?
*564 February 1, 1945
$ $ ' if: ‡ $
Gentlemen: Be: Box, Ammunition, Cal. .50, M2 Contract W19-020-ORD-2462, W19-020-OBD-2624
We submit this letter as claim using warehouse steel as against mill steel. The warehouse tonnage purchased was 846,004 lbs. at a cost of $45,458.22 as against a mill cost of $30,540.74 or a difference of $14,917.48.
This claim for $14,917.48 is based on order #9001 whereas, procurement from warehouse stock is allowed' when item is on the critical list and that facility will be reimbursed for the difference in cost.
We respectfully request reimbursement under the' First War Powers Act, 1941, and Executive Order No. 9001.
Neither the petition dated July 1,1944, nor the revised petition dated August 22, 1944, referred to in the first quoted letter is in evidence.
6. On February 6,1947, which was within a period of six months from the date of approval of Public Law 657, 79th Congress, 2d Session, plaintiff filed a claim for losses incurred' in the performance of contracts Nos. W241-ORD-2719 and W19-020-0RD-2462 under said act, with the Boston Ordnance District of the War Department, which claim was duly referred to the War Contract Hardship Claims Board established by the War Department pursuant to section I of said act. Said board made a determination and denied plaintiff’s claim on June 16,1949, on the ground that plaintiff had failed to furnish in the substance and form required by the Lucas Act and Executive Order 9786, issued pursuant thereto, facts which would enable the board to determine-whether plaintiff had sustained an over-all net loss on all its Government contracts during the statutory period. A copy of said board’s determination and denial is annexed to the-petition and marked “C”, and is in evidence as plaintiff’s, exhibit 4.
This case was.filed herein on December 14,1949, within six months of the receipt by the plaintiff of the adverse action by the War Contract Hardship Claims Board.
*565 7. In advance of the trial, the plaintiff was directed to ■furnish to the defendant “a statement showing the items and figures intended to be proved, with adequate reference to the boohs or records from which such figures were taken.” This was done. The statement furnished by the plaintiff purported to show that on contract 2719 the plaintiff incurred a net loss of $120,028.59, and that the amount of the price differential between the mill and warehouse steel on contract 2462 was $12,626.87. As to the latter figure, the plaintiff contends that this amount was an excess cost to it in the ■procurement of its steel requirements on that contract.
8. The statement furnished by the plaintiff which is referred- to in the previous finding is in evidence as plaintiff’s -exhibit 1. It shows a claimed over-all loss on all Government contracts from December 1940 through August 14, 1945, of $123,235.
A summary of the claimed over-all loss, divided for convenience into two chronological periods, is as follows:

Period Contract Price Cost of Performance Profit or (Loss)

12/30/40 to 7/14/42_ $33, 675. 48 $34,103. 69 ($428. 21)
2/10/43 to 8/14/45_ 2,868,253.40 2,991,060.61 (122,807.21)
Total_ $2, 901, 928. 88 $3, 025, 164. 30 ($123, 235. 42)
9. Plaintiff maintained its books and records in accordance with general accounting practice but did not include a systematic “cost accounting” by which its manufacturing costs would be segregated and accurately stated with respect to individual contracts or products, and there is no detailed accounting in evidence for the costs which it incurred in the performance, severally, of the various' contracts. In lieu of such cost records, plaintiff has introduced in evidence annual oVer-all operating statements for the years 1943, 1944, and 1945 which show, separately, an accounting of its civilian business, its Government work (including contracts 2462 and 2719), and the total of both combined.
10. Following is a summary of the above annual statements insofar as they relate to Government contracts:

*566
Plaintiff’s Statement of Operations for the Tears 1948,1944, and 1945 Combined (Government Contracts)

Sales_1_ $2, 868, 253.40
Cost of Sales: Materials used_ $1,467, 635. 87
Direct labor_ 601,602. 02
Factory overhead_ 307, 945.29
Direct factory costs. 108,287. 51
Termination costs— 236,433.90
Total Cost of Sales_:_ 2,721,904.59
Gross Profit on Sales_ 146,348.81
Operating Expenses_ 269,146.02
Net Operating Profit or (Loss)- ($122,797. 21)
11. During tbe years 1943 and 1944, plaintiff manufactured and sold certain refrigerator parts to the Success Manufacturing Company and rendered invoices for which it received $325,411.79. These transactions were duly recorded in plaintiff’s sales journal and other records.
Success Manufacturing Company was a prime contractor on other Government contracts; it also was a corporation and a wholly owned subsidiary of the plaintiff.
Plaintiff’s recorded cost for the manufacture of these articles' was $160,969.79, so the plaintiff actually realized profit on this subcontract of $164,442.
12. Plaintiff did not include the above transactions or profit in making a determination of its over-all loss on Government contracts, and contends that the above-indicated profit of $164,442 was not a profit but only a transfer of funds to the plaintiff from its subsidiary company which the plaintiff, effectuated by rendering to Success Manufacturing Company bills equal to double the cost of the work.
Plaintiff’s subcontract or other agreement with Success Manufacturing Company is not in evidence, and there is no adequate substantiation in- the record of plaintiff’s repudiation of a profit motive in its performance of the work.
13. Plaintiff further.contends that inasmuch as the transactions were between related companies, the above-indicated profit, or “excess billings,” were properly deducted by it in making its determination “in order to eliminate any profit between related companies in accordance with accepted accounting principles.”
*567 In auditing practice the profit element in intercompany transactions is disregarded in determining a company’s net income or worth, unless such profit has been realized. In this case Burrowes’ profit on the transactions was realized by Burrowes upon payment to it by Success Manufacturing Company, a separate corporation though subsidiary to plaintiff.
14. The contracts under which plaintiff claims to have incurred losses called for the manufacture of a new type of ammunition box developed by the Government. The box was made of several pieces of thin metal welded together in accordance with designs and specifications furnished by the Government.
The specifications originally called for gas welding, but after gas welding on thin metal resulted in a large amount of rejected boxes, the specifications were changed to call for seam welding.
After the boxes were formed and welded, hardware was attached, a cover added, and the box was then sealed with a gasket and painted.
The box was inspected at least six times during processing and was tested after welding and after painting. Boxes that were rejected by the Government inspectors were removed and placed in a different location, where from time to time they were conditioned for civilian use by plaintiff and sold by it to its civilian trade.
15. In the course of manufacture a substantial number of these ammunition boxes were rejected by defendant. At the time of rejection the manufacturing operations on these-boxes were, generally, completed, so that the costs incurred up to the time of rejection were approximately the same for “rejects” as for boxes accepted by defendant under the contracts. The actual costs incurred in these operations by plaintiff are not in evidence.
Plaintiff later, and from time to time, conditioned these rejected boxes and disposed of them in its civilian trade. The actual costs incurred by plaintiff in conditioning these boxes are not in evidence.
16. In 1943,1944, and 1945, the Government rejected and plaintiff disposed of 11,832, 55,606, and 36,316 ammunition *568 boxes respectively, and plaintiff realized the sum of $114,-754.42 by their sale, which amount it credited to civilian sales. In order to avoid any appearance of profit in the transactions, plaintiff adopted the full amount of the sales price ($114,754.42) as the full costs incurred, and included that amount in its cost of civilian sales.
17. The evidence does not disclose, and it is not reasonable to assume, that the amount of costs adopted by plaintiff ($114,754.42) represents the costs incurred by it in conditioning the rejects alone, or that that amount is over and above the costs incurred in their manufacture prior to rejection and charged as a Government cost.
Plaintiff contends that all costs incurred in the manufacture of the boxes up to the time of their rejection are properly á cost of performance under the contract, but it has made no accounting to the Government for the rejects, either as salvage or otherwise.
The cost value of such rejects at the time of their rejection is not in evidence and cannot accurately be computed, but a fair and reasonable determination of such cost value is in the total amount of $90,100.92. This figure is arrived at by reference to the average unit prices under contracts 2462 and 2719, allowing a margin of 10 percent for profit, making the cost value per unit $0.8684 for 103,754 rejects.
18. In its accounting in evidence plaintiff inadvertently understated the cost of materials used on Government contracts in the year 1944, by $100,000. This error is conceded by defendant. Plaintiff’s books show that the cost of materials used on Government contracts in 1944 was in the amount of. $662,979.94.
■ Similarly, plaintiff’s operating statement for the year 1945 in evidence sets forth that the cost of direct labor on Government contracts was in the amount of $204.671.70, in contrast to the related account in plaintiff’s books which indicate this cost to be $159,585.52, the difference being “miscellaneous labor” not connected with Government work.
19. Other items which are part of the cost of performance in plaintiff’s operating statements in evidence are factory overhead and general expenses.
*569 The items represent other costs and expenses of a general nature which are first accumulated in a “pool,” the amount of which plaintiff allocated to its civilian business and its Government work on a pro rata basis, using the total amount of direct labor as a denominator in the case of factory overhead, and the total sales as a denominator for the allocation of general expenses.
In its accounting plaintiff states its total costs for factory overhead as $415,223.56 for the years 1943, 1944, and 1945, and has allocated $307,945.29 of this amount to the cost of performance on Government contraéis. Defendant disputes the correctness of these figures and alleges that the amount of factory overhead properly chargeable as a cost of performance on Government contracts is $235,914.79.
These amounts are dependent on an appraisal of the merit of individual items in a sum total, and additionally on the modification of the pro rata base used in its allocation.
The actual amount of plaintiff’s factory overhead in the period under review, and the amount allocable as a cost of performance on Government contracts, cannot be stated with exactitude, but a fair and reasonable determination of the total amount and the portion allocable to Government work is $387,673.80 and $269,898.46, respectively.
20. Plaintiff’s pool of operating expenses, as claimed in its operating statements in evidence, is in total amount $358,611.74 for the three-year period, of which amount it has allocated $269,146.02 to the cost of performance on Government contracts. Defendant disputes the correctness of these figures and contends that the amount of plaintiff’s operating expenses properly chargeable as a cost of performance on, the Government contracts is $159,242.99.
Plaintiff has included as a part of its total operating expenses for allocation certain selling expenses which were specifically incurred in advancing its sales of window screens' and pool tables and which, therefore, are not in the category of an allocable general expense. In the period under review such specific selling expenses were in the total amount of $47,610.89.
Also included in plaintiff’s claimed amount of operating expenses is an item of $39,948.09. This amount represents *570 annual interest (unpaid) of $13,316.03 for the years 1943, 1944, and 1945 on loans payable. Plaintiff’s books indicate that such loans were in the nature of investment loans made in 1934 and 1935; that no interest accruals on the loans were entered in plaintiff’s books prior to December 31, 1945.
The true amounts allocated or allocable as operating expenses are dependent on an appraisal of the merit of individual items (including the foregoing) in a sum total, and, additionally, on the modification of the pro rata base used in its allocation.
The actual amount of plaintiff’s operating expenses in the period under review, and the amount allocable as a cost of performance on Government contracts, cannot be stated with exactitude, but a fair and reasonable determination of the total amount and the portion allocable to Government work is $355,799.96 and $180,242.02, respectively.
21. There is shown below a summary of plaintiff’s operations on Government contracts and subcontracts in the years 1943, 1944, and 1945, as they are claimed 'by plaintiff and as the values involved are reasonably determined and supported by the evidence.

Plaintiff*8 Reasonable Statements Determination

Sales-$2,868,253.40 $2,957,231.29
Cost of Sales- 2,721,904.59 2,558,182.38
Gross Profit on Sales- 146,348. 81 399,048.91
Operating Expenses- 269,146.02 180,242.02
Net Profit or (Loss)_ ($122,797.21) $218,806.89
It is therefore found that the plaintiff did not sustain a loss during the statutory period. The $17,743.21 paid to the plaintiff pursuant to its termination claim under the Contract Settlement Act of 1944 is not reflected in the profit shown above.
22. As to plaintiff’s claim for the price differential between the cost of mill steel and warehouse steel used in the performance of contract 2462, the detailed costs which the plaintiff incurred in the performance of this contract are not in evidence, and there is no satisfactory proof that the plaintiff incurred an excess cost of $12,626.87, or any excess costs, in its purchase of steel for the work on this contract. It is not shown that the plaintiff’s purchase of warehouse steel was *571 directed by the contracting officer or anyone acting under his authority, or that any promise, express or implied, was made by any representative of the defendant in connection with the price differential on the plaintiff’s steel purchases.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.

 60 Stat. 902; 62 Stat. 992; 41 U. S. C. $ 106, note, as amended.